**UNIVERSAL AMUSEMENT CO., INC., et al.**

v.

**Carol VANCE et al.**

**Civ. A. No. 73-H-528.**

United States District Court, S. D. Texas, Houston Division.

July 3, 1975.

Clyde Woody and Marian Rosen, Woody & Rosen, Houston, Tex., for Universal Amusement Co., Inc., et al.

Joseph G. Rollins, Sr. Asst. City Atty., Joe Moss, Asst. Dist. Atty., Houston, Tex., Lonnie F. Zwiener, Asst. Atty. Gen., Austin, Tex., for Carol Vance et al.

Malcolm Dade, Dallas, Tex., J. Mack Ausburn, San Antonio, Tex., Frierson M. Graves, Jr., Memphis, Tenn., for King Arts Theatre, Inc.

John L. Hill, Atty. Gen., by Max P. Flusche, Jr., Asst. Atty. Gen., Austin, Tex., for George E. McCrea et al.

Mike Aranson, Tony Kaufman, Dallas, Tex., for Ellwest Stereo Theatres, Inc.

N. Alex Bickley, City Atty., Joseph G. Werner, Asst. City Atty., Dallas, Tex., for Donald Byrd and Mel Southall.

John B. Tolle, Asst. Dist. Atty., Dallas, Tex., for Robert Cole.

John L. Hill, Atty. Gen., by Lonny F. Zwiener, Asst. Atty. Gen., Austin, Tex., for State of Texas.

J. Mack Ausburn, San Antonio, Tex., for Richard C. Dexter.

Keith W. Burris, Dist. Atty., Nelson M. Atwell, Asst. Crim. Dist. Atty., Edgar Pfeil, Jane H. Macon, San Antonio, Tex., for Ted Butler et al.

Before INGRAHAM, Circuit Judge, and SINGLETON and TAYLOR, District Judges.

SINGLETON, District Judge:

## I. *Introduction*

This case comes before this three-judge court in a unique posture. The original case, *Universal Amusements v. Vance,* the captioned case, was brought in the Southern District of Texas, Houston Division, and concerned the impending trial of a motion picture theater operator who had shown the film "Deep Throat." Plaintiffs in that case challenged the constitutionality of article 527 of the Texas Penal Code which at that time constituted the statutory law in Texas on obscenity. The plaintiffs sought, among other remedies, injunctive relief to enjoin the pending criminal prosecution. This three-judge court was constituted as a result of that case.

At approximately the same time as the Houston prosecutions were being instituted and carried out, a motion picture theater operator in Dallas, Texas, was being prosecuted for also showing "Deep Throat." This prosecution was under the same statute. Chief Judge John R. Brown consolidated these two "Deep Throat" cases.

In May of 1973 a hearing on a preliminary injunction was heard by a three-judge court and denied. The cases were then continued. Over the next two years, many changes in the posture of these cases occurred. The Houston state court prosecution for the showing of the motion picture "Deep Throat" was twice tried. Each time the trial ended in a mistrial because the jury was unable to agree on a verdict. More importantly, however, the prosecution for alleged obscenity-connected activities mushroomed all over the state of Texas. Each time a defendant would seek to have his obscenity prosecution enjoined in a federal court in Texas, Chief Judge John R. Brown would consolidate such case with the instant three-judge case. A full list of all of the cases can be found in an appendix to this opinion.

On August 12 the managing judge of this three-judge court, Honorable John V. Singleton, held a pretrial conference at which attorneys representing all of the parties in each of the cases then consolidated appeared.

The cases, as they were consolidated into the original case, presented a variety of challenges to Texas statutes. Not only was the constitutionality of the substantive obscenity statutes challenged but also the use of statutes allegedly designed for purposes other than the closing down of purported commercial obscenity was challenged, as were the old and new public nuisance statutes used to

abate the alleged public nuisance of commercial obscenity. Finally, the law on obscenity had changed. In June of 1973, the Supreme Court decided the Miller quintet.[1] Shortly thereafter, two more important cases in the obscenity field were decided: *Heller v. New York*, 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973) and *Roaden v. Kentucky*, 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973). These cases dealt not with substantive obscenity laws but with the procedures to be used to bring into court those who are alleged purveyors of obscenity. The Texas obscenity laws, too, had changed. On January 1, 1974, the old article 527 was repealed, and in its place section 43.21 et seq. of the new penal code was enacted. The Texas nuisance statutes, also, were changed to specifically provide for the enjoining of the use of a premises for purposes of commercial obscenity.

In an effort to simplify the process of deciding all of these varied cases, the managing judge chose three of the cases which presented the least jurisdictional problems and also presented straightforwardly at least one of the challenges brought on by each of the remaining cases.

On November 15, 1974, the three-judge court again convened to hear oral arguments in each of the three cases. Each of the three sets of parties had earlier submitted a joint Pretrial Order, in which material and important facts had been stipulated and briefs on the points of law involved. Two of the cases have remaining factual disputes, but these are immaterial to the determination of these cases.

II. *King Arts Theatre v. McCrea, CA–6–345*

The *King Arts* case comes out of San Angelo, Tom Green County, Texas. The

---

1. The so-called *Miller* quintet consists of five companion cases handed down on June 21, 1973: *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); *Kaplan v. California*, 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973); *United States v. 12 200-Ft. Reels*, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); and *United States v. Orito*, 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed. 2d 513 (1973).

plaintiffs are challenging the facial constitutionality of article 4667 of Vernon's Annotated Civil Statutes which provides for the abatement of public nuisances and, specifically, the inclusion, as a nuisance, of premises for purposes of commercial obscenity. The facts, as agreed to by the parties are as follows. King Arts Theatre, Inc., was operating an adults-only, enclosed motion picture theater in San Angelo, Texas. The theater showed sexually explicit films. On October 30, 1973, the landlord from whom the theater building was rented notified King Arts Theatre, Inc., that, at the suggestion of George E. McCrea, the county attorney of San Angelo, he was terminating the lease of the building as of November 15, 1973. The notice further informed the plaintiff that McCrea had contacted the landlord and told him that he intended to bring an application for an injunction to abate the theater as a public nuisance in order to prohibit the future showing of allegedly pornographic motion pictures.

Plaintiff filed suit on November 12, 1973, requesting a declaratory judgment and injunctive relief. By agreement all parties have determined that the *status quo* will be maintained until the determination of this case.

The county attorney still intends to seek an injunction based on the nuisance statute and to pursue his intention to cancel the lease of the premises.

 The initial hurdle which has faced this court since the inception of these suits does not face us in this suit. That is the *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), hurdle. In the instant case there is no pending criminal or civil prosecution because the county attorney determined that he should wait until the three-judge court had determined the issues before pursuing his intentions. Although the parties could not confer upon the court by agreement jurisdiction where it was lacking, the actions of the county attorney in failing to actively pursue his threatened course of action would cer-

tainly lessen the court's considerations of equity, comity, and federalism upon which *Younger* is based. At the same time, however, the existence of the threat of a real prosecution under the nuisance statute is enough to present an actual controversy as required by Article III of the Constitution. *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). One further question must be answered before we move to the merits of this case. The plaintiff moves for an injunction to prevent the state from utilizing the nuisance statute against it. A traditional prerequisite to injunctive relief, however, has been irreparable injury. This is true whether the injunction seeks to stop the activities of private citizens or the activities of the state, whether criminal or civil. *Steffel v. Thompson, supra,* has suggested that the question of whether or not injunctive relief can be granted in a threatened but not yet pending criminal case brought by the state may depend upon the status of the alleged criminal activity:

We note that, in those cases where injunctive relief has been sought to restrain an imminent, but not yet pending, prosecution *for past conduct,* sufficient injury has not been found to warrant injunctive relief, see *Beal v. Missouri P. R. Corp.,* 312 U.S. 45, 61 S. Ct. 418, 85 L.Ed. 577 (1941); *Spielman Motor Sales Co., Inc. v. Dodge,* 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322 (1935); *Fenner v. Boykin,* 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927 (1926). There is some question, however, whether a showing of' irreparable injury might be made in a case where, although no prosecution is pending or impending, an individual demonstrates that he will be required to *forego* constitutionally protected activity in order to avoid arrest. Compare *Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); *Hygrade Provision Co., Inc. v. Sherman,* 266 U.S. 497, 45 S.Ct. 141, 69 L.Ed. 402 (1925); and *Terrace v. Thompson,* 263 U.S. 197, 214,

216, 44 S.Ct. 15, 18, 68 L.Ed. 255 (1923), with *Douglas v. City of Jeannette,* 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943) . . . .

415 U.S. at 463, n. 12, 94 S.Ct. at 1218.

■ In the instant suit the plaintiff is being threatened with the use of a civil statute, although it would be used by the district attorney, and in a real sense the plaintiff would be "prosecuted" by the state.[2] Although it might be termed quasi-criminal in nature, the statute in question does not provide for the incidents of a true criminal statute such as arrest or the posting of a bond. The inconveniences a prosecution of the nuisance statute would bring would not rise to the level of irreparable injury, at least on the facts presented in the instant case. For that reason, the court will confine itself to the question of a declaratory judgment.

The merits of the *King Arts* case present two questions for decision because of the structure of the Texas obscenity laws themselves. As originally threatened by the county attorney of Tom Green County, the nuisance statute, article 4667 of Vernons Annotated Civil Statutes, provided for the enjoining of "the habitual use, actual, threatened or contemplated, of any premises, place or building or part . . . [f]or keeping, being interested in, aiding or abetting the keeping of a bawdy or disorderly house, as those terms are defined in the Penal Code."

Article 513 of the old Texas Penal Code defined a "disorderly house" in section 2(a) as "any house, building, theater or other structure where obscene motion pictures are displayed, exhibited or shown to persons under twenty-one (21) years of age." Section 2(c) and

2(d) of the statute defined "obscene motion picture" and "prurient interest" in the *Roth-Memoirs*[3] language virtually identical to that of the old penal code obscenity statute, article 527. The only material difference is that article 513 adds a sentence defining "contemporary community standards." The King Arts Theatre, Inc., was originally threatened with the use of these statutes.

After January 1, 1974, both the nuisance laws and the obscenity laws of Texas were changed. Article 527, "Obscene Articles" and article 513, "Disorderly House" were repealed by the enactment of the new penal code and article 4667 of the Texas Civil Statutes was rewritten. The new article 4667, "Injunctions to abate public nuisances" provides for the enjoining of the "habitual use, actual, threatened or contemplated, of any premises, place or building or part thereof . . . (d) [f]or the commercial manufacturing, commercial distribution, or commercial exhibition of obscene materials . . . ."

Although one is not directed to the definition of obscenity by the statute itself, the logical place to find the state's definition of obscenity would be in the new Penal Code, § 43.21, which defines obscenity in virtually the same terms as the old article 527.

The plaintiffs have challenged the nuisance statute because its use necessarily refers one to the Penal Code § 43.21 definition of "obscene." This definition is challenged for the reasons that (1) the definition of obscenity is too vague and indefinite; (2) the statute as it is written or as it is construed is unconstitutional because it does not specifically define the sexual conduct prohibited, it does not give fair notice, and it is overbroad.

2. It is interesting to note that the Supreme Court has very recently held that a similar Ohio statute was more akin to a criminal prosecution than are most civil cases. *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975).

3. *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), and

*Memoirs v. Massachusetts,* 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), are two Supreme Court cases which set out tests and definitions of obscenity. Their language forms the basis of almost all state statutory law governing obscenity, including both the old and new Texas statutes. Their language has been supplanted by the *Miller* quintet.

In a lengthy and exhaustive opinion, *West v. State of Texas*, Tex.Cr.App., 514 S.W.2d 433, decided October 9, 1974, the Texas Court of Criminal Appeals addressed the question of the constitutionality of the article 527 definition of obscenity. In the *West* case the appellant had been convicted in June of 1971 of exhibiting obscene matter under article 527. The conviction was affirmed in 1972. 489 S.W.2d 597 (Tex.Cr.App. 1972). A writ of certiorari was granted by the United States Supreme Court, the judgment of the Texas Court of Criminal Appeals was vacated, and the case was remanded for further consideration by the Court of Criminal Appeals, in light of the Supreme Court's *Miller* quintet on October 23, 1973. *West v. Texas*, 414 U.S. 961, 94 S.Ct. 268, 38 L. Ed.2d 209. On February 13, 1974, the Court of Criminal Appeals again affirmed the conviction, but the court granted appellant's motion for leave to file a motion for rehearing. In the opinion denying appellant's motion for rehearing the Court of Criminal Appeals held that although article 527 was perhaps deficient on its face, it had been authoritatively construed by the courts of Texas, and these previous authoritative constructions of the statute supplied any constitutional deficiencies. *West v. State*, 514 S.W.2d 433 (Tex.Cr.App. 1974).

Article 527's definition of obscenity has been reenacted, effective January 1, 1974, in § 43.21 of the new Texas Penal Code. The "Practice Commentary" of the Code points out that the language "sex, nudity, or excretion" replaces the old term "sexual matters" in article 527's definition of "obscene." Section 43.21 reads:

Definitions.

In this subchapter:

(1) "Obscene" means having as a whole a dominant theme that:

(A) appeals to a prurient interest in sex, nudity, or excretion;

(B) is patently offensive because it affronts contemporary community standards relating to the description or representation of sex, nudity, or excretion; and

(C) is utterly without redeeming social value.

(2) "Material" means a book, magazine, newspaper, or other printed or written material; a picture, drawing, photograph, motion picture, or other pictorial representation; a statue or other figure; a recording, transcription, or mechanical, chemical, or electrical reproduction; or other article, equipment, or machine.

(3) "Prurient interest" means a shameful or morbid interest in nudity, sex, or excretion that goes substantially beyond customary limits of candor in description or representation of such matters. If it appears from the character of the material or the circumstances of its dissemination that the subject matter is designed for a specially susceptible audience, the appeal of the subject matter shall be judged with reference to such audience.

(4) "Distribute" means to transfer possession, whether with or without consideration.

(5) "Commercially distribute" means to transfer possession for valuable consideration.

The *West* opinion deals with a gloss on the "sexual matters" term, but this court believes that the Court of Criminal Appeals would apply that gloss to the substituted terms, "sex, nudity, or excretion."

Both article 527 and section 43.21 have taken their language from the definition found in *Memoirs v. Massachusetts*, 383 U.S. 413, 86 S.Ct. 975, 16 L. Ed.2d 1 (1966), and *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L. Ed.2d 1498 (1957). This definition differs from the new *Miller* definition in two ways. First, under *Miller* the state does not need to prove that the matter is utterly without redeeming social value. Proof of such a negative was felt by the

Supreme Court to be a virtual impossibility and an unnecessary hindrance to the state's prosecutorial functions. In place of the "utterly without redeeming social value" postulate, the Supreme Court substituted the requirement that the state prove the matter lacking in "serious literary, artistic, political, or scientific value."

In the second place, the Supreme Court changed the standard to require the state's obscenity laws clearly and specifically to define what is meant by obscene matters:

We now confine the permissible scope of such regulation to works which depict or describe sexual conduct. That conduct must be specifically defined by the applicable state law, as written or authoritatively construed.

413 U.S. at 24, 93 S.Ct. at 2614. Further on in the opinion the Court indicates that these specific definitions are to be of "hard core" pornography only. 413 U.S. at 27, 93 S.Ct. 2607.

Footnote 6 of the *Miller* opinion, 413 U.S. at 24, 93 S.Ct. at 2615, clearly indicates that the new *Miller* standard for obscenity is not intended to require the states except Oregon and Hawaii, whose definitions of specific sexual conduct are given as examples by the Court, to enact new obscenity laws. "Other existing state statutes, as construed heretofore or hereafter, may well be adequate."

■ This court must answer the question of whether or not the Texas statute can pass the *Miller* test on this issue. Whether referred to as "sexual matters," the term which concerned the Court of Criminal Appeals, or "sex, nudity, or excretion," which concerns this court, the defined sexual conduct, the depiction of which is forbidden by the Texas statutes, old or new, is not sufficiently specific on its face to satisfy *Miller*. How-

ever, the construction of the statute by the Court of Criminal Appeals may well save the statute. The Court of Criminal Appeals so held in the *West* case.

In the *West* opinion, the Court of Criminal Appeals interpreted and restricted the term "sexual matters" used in the article 527 § 1 definition of obscenity to the examples the Supreme Court used in *Miller*:

(a) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated.

(b) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals.

413 U.S. at 25, 93 S.Ct. at 2615.

Further, the Court of Criminal Appeals cited five cases handed down prior to the *Miller* case in which either the Court of Criminal Appeals or the Court of Civil Appeals had construed the statute as forbidding conduct which would fit into the examples which the Supreme Court gave.[4]

■ The cases show that the courts of Texas have adhered rather closely to the ideas of the Supreme Court of what constitutes obscenity. Although it seems to this court that the obscenity laws, even the most specific, are by their natures vague,[5] we cannot hold in light of the *Miller* quintet's guidelines that the Texas statute, as construed, is impermissibly so.

In *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), one of the more recent Supreme Court cases on the obscenity subject, the Court faced a challenge to the federal obscenity statute, 18 U.S.C. § 1461, which had repeatedly been held not unconstitutionally vague. The statute was

---

4. *Phelper v. State*, 396 S.W.2d 396 (Tex. Cr.App.1965), *Moore v. State*, 470 S.W.2d 391 (Tex.Civ.App.—San Antonio 1971), writ ref'd n. r. e., *Bryers v. State*, 480 S.W.2d 712 (Tex.Cr.App.1972), *Hunt v. State*, 475

S.W.2d 935 (Tex.Cr.App.1972), and *Thacker v. State*, 490 S.W.2d 854 (Tex.Cr.App.1973).

5. *Cf.* discussion in *Roth v. United States*, 354 U.S. 476, 491–492, 77 S.Ct. 1304, 1 L.Ed.2d 1498.

again challenged on the grounds that now the statute was unconstitutionally vague because its language did not contain, nor had it been construed to apply, to the specific types of conduct set out in *Miller*. The Court held that that argument "fundamentally misconceives the thrust of our decision in the *Miller* cases." The Court reiterated that the purpose of the *Miller* quintet was not to invalidate all existing statutes. "The *Miller* cases . . . were intended neither as legislative drafting handbooks or as manuals of jury instructions." Since in *United States v. 12 200-foot Reels of Film*, 413 U.S. 123, 93 S.Ct. 2665 (1973), one of the *Miller* cases, the Court had clearly indicated that the federal statute would in the future be construed as dealing only with obscenity such as that described in *Miller*, and since it was also clear that the material found obscene in *Hamling* was well within the *Miller* limits, the Supreme Court found that 18 U.S.C. § 1461, on its face, as construed, or as applied to appellant Hamling was not void for vagueness.

A related argument in *Hamling* that the statute did not give appellant fair warning of the crime, in light of the new *Miller* standards, failed because the Court pointed out that *Miller* presented a "clarifying gloss" to a statute. It did not make criminal, conduct which was not previously thought to be criminal.

The plaintiff has not presented any other specific challenges to the vagueness and overbreadth of section 43.21 (formerly article 527), although he has challenged the statute generally for this reason. The statute tracks the language of the *Memoirs-Roth* cases as we have seen, and although *Miller* may have served to clarify that language to a greater extent, *Hamling* makes clear that *Miller* was never intended to invalidate that language completely. Of the two changes which *Miller* made on the *Memoirs-Roth* language, one would render the Texas statute now more stringent than is constitutionally necessary, and the other has now been authorita-

tively and definitely included in the statutory language through judicial construction by the highest criminal court in the state.

It is clear to this court, therefore, that as it would be incorporated by reference into the nuisance statute scheme, the Texas Penal Code definition of obscenity is not unconstitutionally vague, overbroad, or invalid because it fails to give adequate notice.

■ The plaintiffs have urged us to hold that the Texas definition as now construed by the Court of Criminal Appeals cannot be used retroactively since the defendants would not have a clear notice of the new construction. The Court of Criminal Appeals rejected that argument in *West v. State*, but the Supreme Court in *Hamling* was not called upon to give a definite ruling since the conduct in *Hamling* so clearly fell within the *Miller* "examples." The posture of the instant case, in which there are no pending cases to say nothing of a criminal conviction, is such that this court, as much as it would prefer to dispose of all issues at one time, believes that it would be highly improper to rule on a point which is not yet ripe for adjudication.

In considering the plaintiff's second challenge to the public nuisance statute, article 4667, we must also consider its companion statutes, articles 4665 and 4666.

Article 4665, "Nuisance; evidence" provides:

> Proof that any of said prohibited acts are frequently committed in any of said places shall be prima facie evidence that the proprietor knowingly permitted the same, and evidence that persons have been convicted of committing any said act in a hotel, boarding house or rooming house, is admissible to show knowledge on the part of the defendants that this law is being violated in the house. The original papers and judgments or certified copies thereof in such cases of convictions may be used in evidence in the suit for injunction and oral evidence

is admissible to show that the offense for which said parties were convicted was committed in said house. Evidence of general reputation of said houses shall also be admissible to prove the existence of said nuisance.

Article 4666, "Nuisance; prosecution," was not changed by the legislature when these other statutes were redrawn. It is the only nuisance statute which can be used in the obscenity field because article 527 § 1 was repealed with the enactment of the new penal code. The statute provides that upon "reliable information" that a nuisance exists, the attorney general, the district attorney, or the county attorney shall bring suit in the name of the state to abate and enjoin the nuisance. If the state wins, the nuisance is abated and the defendants enjoined from maintaining it. The premises are to be closed for one year unless "the owner, tenant, or lessee" makes bond "in the penal sum of not less than $1,000 nor more than $5,000," with the condition that "the acts prohibited in this law shall not be done or permitted to be done in said house."

The plaintiffs have challenged the use of these Texas nuisance statutes against the operation of allegedly obscene motion picture theaters or bookstores because the statutes present a classic example of a prior restraint and because the procedural safeguards are inadequate to protect the dissemination of nonobscene materials which might be caught up with the obscene. Since nonobscene expression is entitled to first amendment protection, the threat which these statutes may present to the first amendment is of serious consideration.

The plaintiffs do not contend that the state cannot enjoin the showing of motion pictures which have been adjudicated obscene. Rather, the argument is that the statute is unconstitutional in providing that once a theater is declared a nuisance, it is to be shut down for one year unless a bond is posted. This prevents the showing of motion pictures that have not been determined obscene.

Although it is now clear that "obscenity is not within the area of constitutionally protected speech or press," *Roth v. United States*, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957), it is equally as clear that the censor has the burden of proving that a film is obscene. *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, (1975). To prove that a motion picture theater has been the scene of the showing of films that are obscene is not to prove that every film shown in that theater, in the past, present, or future, was, is, or will be obscene. By completely shutting down the operation of a motion picture theater, or by forcing the posting of a bond to keep the theater open, the state has imposed a prior restraint upon the showing of motion pictures. Motion pictures are protected by the free speech and free press guarantees of the first amendment, *Interstate Circuit, Inc. v. Dallas*, 390 U.S. 676, 88 S.Ct. 1298, 20 L.Ed.2d 225 (1968), although they are not "necessarily subject to the precise rules governing any other particular method of expression." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503, 72 S.Ct. 777, 781, 96 L.Ed. 1098, 1106 (1952). That this statute is clearly a prior restraint upon the showing of motion pictures cannot be disputed. *Cf. Near v. Minnesota*, 238 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1930). ". . . [U]nder the Fourteenth Amendment, a State is not free to adopt whatever procedures it pleases for dealing with obscenity . . . without regard to the possible consequences for constitutionally protected speech." *Marcus v. Search Warrant*, 367 U.S. 717, 731, 81 S.Ct. 1708, 1716, 6 L.Ed.2d 1127 (1961). Since "[a]ny system of prior restraints of expression . . . bear[s] a heavy presumption against its constitutional validity," *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d

1 (1971), a statute which would impose such a prior restraint is to be "tolerated . . . only where it operate[s] under judicial superintendence and assure[s] an almost immediate judicial determination of the validity of the restraint." *Bantam Books,* 372 U.S. at 70, 83 S.Ct. at 639. The statute in question, by providing for the closing down of the theater or posting bond has not provided for a judicial determination of the obscenity of future motion pictures which may be shown in the theater.

In its defense the state has tried to distinguish the instant case from *Near v. Minnesota, supra,* but the attempt is not successful. In both cases the state made the mistake of prohibiting future conduct after a finding of undesirable present conduct. When that future conduct may be protected by the first amendment, the whole system must fail because the dividing line between protected and unprotected speech may be "dim and uncertain." *Bantam Books v. Sullivan,* 372 U.S. at 66, 83 S.Ct. 631. The separation of these forms of speech calls for "sensitive tools," *Speiser v. Randall,* 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), not the heavy hand of the public nuisance statute.

■■■ The state defends the statute by its assertion that the injunction which would abate the nuisance can be carefully drawn and highly descriptive of the kinds of films which are to be prohibited, citing the Texas Court of Civil Appeals case, *Richards v. State,* 497 S.W.2d 770 (Tex.Civ.App.—Beaumont, 1973), which dealt with an injunction outside the scope of article 4667. In that case the Texas court recognized that the injunction imposed a prior restraint, but upheld it because of "the specificity of the prohibiting order, the course of conduct of the defendants, and the fact that such forbidden future exhibitions would be of hard core pornography." With all respect to the Court of Civil Appeals sitting in Beaumont, this court disagrees with that court's disposition of the case.

In disagreeing with the Court of Civil Appeals, we fall back on the reasoning of *Near v. Minnesota,* 283 U.S. at 713, 51 S.Ct. at 630 (1930):

If we cut through mere details of procedure, the operation and effect of the statute in substance is that public authorities may bring the owner or publisher of a newspaper or periodical before a judge upon a charge of conducting a business of publishing scandalous and defamatory matter—in particular that the matter consists of charges against public officers of official dereliction—and unless the owner or publisher is able and disposed to bring competent evidence to satisfy the judge that the charges are true and are published with good motives and for justifiable ends, his newspaper or periodical is suppressed and further publication is made punishable as a contempt. This is the essence of censorship.

In the instant case if we cut through the details of procedure the substance of the statute is that the public authorities may bring the owner or operator of a motion picture theater before a judge upon a charge of commercially manufacturing, distributing, or exhibiting obscene material. Once the state has proved that he has manufactured, distributed, or exhibited obscene materials, his theater is abated for one year unless he posts a bond of from $1,000 to $5,000. Unless the bond is posted, further showing of any motion picture is punishable by contempt of court. If the bond is posted then motion pictures may be shown, but should at any time the owner or operator step over that fine line between obscenity and nonobscenity, then the bond is forfeited. To this court, that is the essence of censorship.

As dissenting Justice Butler points out in *Near,* the newspapers which the Minnesota statute affected in *Near* were not ordinary newspapers criticizing the actions of public officials. These newspapers were engaged in harsh and malicious diatribes often employing racial

ephithets and highly improbable statements. Justice Butler was concerned that the "distribution of scandalous matter is detrimental to public morals and to the general welfare." 283 U.S. at 728, 51 S.Ct. at 635. His dissent, if paraphrased, could make a logical and telling argument for the defense of the nuisance statute in the instant case. Yet, the majority of the Supreme Court held the first amendment more important.

In *Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 445, 77 S.Ct. 1325, 1330, 1 L. Ed.2d 1469 (1957), the Supreme Court explained its *Near* decision as striking down the state's attempt to "enjoin the dissemination of future issues of a publication because its past issues had been found offensive." This alone, the Court stated, was enough to condemn the statute, without any reference to the fact that *Near* involved not obscenity, but matters derogatory to public officials, *i. e.*, politics.

In neither the *Near* case nor the instant case does the state seek to condemn that which is wholesome or deserving of protection, yet the flaw of both statutes is that in preventing the dissemination of the unwholesome it prevents the dissemination of that which is presumed to be legal and protected by the first amendment without a prior judicial determination of illegality.

*Times Film Corp. v. Chicago*, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961) held that prior restraints are not per se unconstitutional, however, and the *Near* case itself left open to the state the possibility of presenting "exceptional circumstances" the showing of which would permit a valid prior restraint of first amendment activities. Among the several examples of situations in which previous restraint of speech may be allowable is: "the primary requirements of decency may be enforced against obscene publications." *Near v. Minnesota*, 283 U.S. at 716, 51 S.Ct. at 631.

*Near* does not suggest, however, that even within these exceptional cases there might not be room for invalid restraints, and *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), made this clear when it set forth guidelines for permissible prior restraints:

First, the burden of proving that the film is unprotected expression must rest on the censor. . . .

Second, while the State may require advance submission of all films, in order to proceed effectively to bar all showings of unprotected films, the requirement cannot be administered in a manner which would lend an effect of finality to the censor's determination whether a film constitutes protected expression. . . . [O]nly a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint. . . . To this end, the exhibitor must be assured, by statute or authoritative judicial construction, that the censor will, within a specified brief period, either issue a license or go to court to restrain showing the film. Any restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution. . . . [T]he procedure must also assure a prompt final judicial decision, to minimize the deterrent effect of an interim and possibly erroneous denial of a license.

380 U.S. at 58–59, 85 S.Ct. at 739. The language of *Freedman* has been reemphasized in *Southeastern Promotions, Ltd.*, 420 U.S. at 559, 95 S.Ct. at 1247.

*Freedman* was specifically concerned with the licensing requirement imposed upon film exhibitors. Although the instant case imposes a reverse situation, we have found that it operates, in effect, as a censoring-licensing statute. The *Freedman* language thus gives a great deal of guidance to our decision in the instant case. The key to the *Freedman*

case seems to be initial suppression for the shortest fixed period of time until a judicial determination is made and then final suppression *only* after a judicial determination in an adversary context.

By instituting the injunction procedure for a public nuisance, however, the State of Texas is not interested in preserving the *status quo*. The injunction seeks to change the situation by preventing the dissemination of obscenity, but it does not provide for a short fixed time in which a final determination of obscenity can be made.

With this in mind we turn to the procedural framework in which the public nuisance statute operates. The specific requirements of obtaining an injunction in Texas, which would presumably be utilized in actions pursuant to article 4667, leave much to be desired if they are used in the obscenity context. Rules 680–693a of the Texas Rules of Civil Procedure provide the injunction procedures for Texas. Pursuant to those rules, the state could obtain a temporary restraining order lasting up to ten days, ex parte. As soon as possible, within that ten days, however, a hearing on a temporary injunction is obtainable. The temporary injunction is not a final adjudication on the merits but, once it is obtained, there is no provision for treating the case any differently from any other civil case. The lack of a provision for a swift final adjudication on the obscenity question raises serious doubts of the constitutional usability of the injunction process in Texas for an obscenity situation.

■ Article 4665 provides that evidence of "general reputation" is also admissible to prove the existence of the nuisance. The rather vague term leaves in constitutional doubt the means by which the prosecution would prove the obscenity alleged. Certainly it leaves open the strong possibility that a constitutional definition of obscenity would not be used. Articles 4666 and 4667 do not even provide by their terms any judicial determination of obscenity prior

to the issuance of the injunction. Thus, it is seen that the Texas public nuisance statute does not even begin to fit into the guidelines for permissible prior restraints.

Article 4667(a)(3) of Vernon's Annotated Civil Statutes operates as an invalid prior restraint on the first amendment rights of those who commercially manufacture, distribute, or exhibit materials which may be thought by the state to be obscene but which have not yet been judicially determined to be obscene. For that reason this court hereby declares that article 4667(a)(3) of Vernon's Annotated Civil Statutes is unconstitutional on its face.

III. *Richard Dexter v. Ted Butler, SA 74–CA–168*

The facts of this case are very simple. On four successive occasions—June 24, 1974, June 28, 1974, July 2, 1974, and July 6, 1974—an officer of the San Antonio, Texas, police force entered the Fiesta Theatre, paid the $5 admission charge, and viewed the film "Deep Throat." After viewing the film, he wrote out a report and signed a "Motion for Adversary Hearing" to determine whether or not there was probable cause to seize the film for violating the Texas obscenity laws. The motion was presented to a magistrate who ordered the cause set for a hearing. The plaintiff, who was either merely an employee of the Fiesta Theatre or was its lessee and manager, it matters not to the decision in this case, was notified of the hearing and was advised to call his attorney. Within a half hour to an hour, on each occasion, the hearing was begun. The plaintiff, after consulting with his attorney, waived counsel at the hearing. The hearing was conducted in an unwavering pattern. First, the officer who had viewed the film was called to the stand to testify as to the contents of the film, then the film was viewed by the magistrate. After the viewing of the film, the magistrate issued a search warrant to seize the film and to seize the projector as a "criminal instrument"

pursuant to § 16.01 of the Texas Penal Code. On the first three occasions, the plaintiff was then arrested, either alone or in company with another theater employee, and charged with "use of a criminal instrument," and "commercial obscenity" in violation of § 43.23 of the Texas Penal Code. On the fourth occasion, theater employee Wayne Walker alone was arrested and charged with those offenses. Some $55,000 worth of bonds was set on the plaintiff.

After each seizure the theater obtained another copy of the same motion picture, "Deep Throat," and another projector. The theater continued to operate as usual, except when the film was seized and it was necessary to secure another film and another projector.

The charge of commercial obscenity, § 43.23 Texas Penal Code, is a class B misdemeanor. Section 12.22 of the Texas Penal Code provides for a fine not to exceed $1,000, confinement not to exceed 180 days, or both. The misdemeanor charges were set for trial in County Court No. 3, Bexar County, Texas, and it is the court's understanding that they have been tried. The plaintiff has no quarrel in this court with the charges against him brought pursuant to § 43.-23. He is challenging, however, the use against him of § 16.01—the criminal instruments statute. That statute provides that it is a class 3 felony and § 12.34 provides for confinement of not more than ten years nor less than two years and a fine not to exceed $5,000. None of the felony charges of violation of § 16.01 on the plaintiff has been presented to the grand jury for indictment, but felony complaints have been filed in each instance and the cases are "pending" in that sense.·

The defendants have based their entire defense upon their contention that this court lacks the jurisdiction to hear the merits of the case because of the *Younger v. Harris* doctrine. Defendant has presented no arguments to support the constitutionality of § 16.01 or its application.

The *Younger v. Harris* doctrine[6] must give us pause since charges have been filed against the plaintiffs for violation of § 16.01. The criminal cases could be said to be "pending" although the charges have never been presented to the grand jury. What definitely constitutes a pending case has yet to be determined, but even if we unwaveringly held that the cases are "pending," that does not end our discussion. The *Younger* doctrine is not an absolute. Federal intervention, in the proper case, is allowed. The plaintiff asserts that this is the proper case. The defendant maintains that the plaintiff has failed to plead or prove any bad faith harassment or irreparable injury, the absolute prerequisite for a circumvention of *Younger v. Harris*. Yet, plaintiff has shown that the defendant, in the latter part of June, 1974, instituted a program of repeated seizures of the film, "Deep Throat," and the projector which showed it, charging theater personnel with not only commercial obscenity, but with felony use of a criminal instrument and then failing to present the felony cases to a grand jury. The second seizure of the identical film was not preceded by a judicial determination of the obscenity of the film "Deep Throat." It is obvious that the city of San Antonio was engaged in an "all out" effort to suppress this film. The fourth seizure was the last only because this case· was

6. In 1971 the Supreme Court of the United States decided six cases on the same day which stand for the general proposition that based on considerations of federalism, equity, and comity, federal courts should refrain from enjoining or in any way interfering with pending state court criminal prosecutions, except in very limited circumstances. *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), *Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), *Boyle v. Landry*, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971), *Perez v. Ledesma*, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971), *Byrne v. Karalexis*, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971), and *Dyson v. Stein*, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed. 2d 781 (1971).

filed in federal court and further seizures were enjoined. In order to fully comprehend the innovative tactics San Antonio put into practice, it is necessary to look at the language of § 16.01 of the new Texas Penal Code:

Unlawful use of Criminal Instrument. (a) A person commits an offense if: (1) he possesses a criminal instrument with intent to use it in the commission of an offense; or

(2) with knowledge of its character and with intent to use or aid or permit another to use in the commission of an offense, he manufactures, adapts, sells, installs, or sets up a criminal instrument.

(b) For purposes of this section, "criminal instrument" means anything that is specially designed, made, or adapted for the commission of an offense.

(c) An offense under this section is a felony of the third degree.

The words of subpart (b) of the statute clearly indicate that a criminal instrument is not equipment which is designed, made, or adapted for a lawful use, but which incidentally may be used for the commission of a crime. There are many, many common, ordinary, everyday objects which can be used to commit crimes, but these are not criminal instruments. If the clear language of the statute is not sufficient to guide law enforcement officers, the "Practice Commentary" which immediately follows the statute has been provided by the drafters of § 16.01. Although the "Practice Commentary" does not have the force of law, it does give us as much information as legislative history because, having been written by authorities in the field, it is intended for the practitioner who utilizes the newly enacted statute to give him a better idea of the statute's meaning. The "Practice Commentary" for section 16.01 says:

It [the statute] aims at terminating incipient criminal activity, the existence of which is indicated by conduct involving a "criminal instrument."

The mere possession or manufacture of things specially designed for the purpose of accomplishing a criminal objective is strong evidence of criminal intent. The instrument must be *specially* designed, made, or adapted for the commission of an offense, however; things frequently used in crime, but which have common, lawful uses, are excluded from the purview of Section 16.01 because possession of such things, alone, is conduct too ambiguous for imposition of the criminal sanction. . . .

From this commentary and from the clear language of the statute itself, it can be seen that the statute is not a "use" statute at all. Rather, it is a statute aimed at incipient crime—possession of a criminal instrument, with the specific intent to use the instrument in the commission of a crime. Not only is it not aimed at an instrument which has lawful uses, but it is not aimed at overt criminal actions at all.

Charging the plaintiff with a § 16.01 violation with whatever motive the district attorney now would claim cannot have been undertaken with any design to actually convict the plaintiff of the crime. The articles which plaintiff possessed are stipulated to be ordinary 16 millimeter portable film projectors. Such a blatant use of an inappropriate statute, which bootstrapped the misdemeanor offense into a felony was effective in requiring that bail for a felony offense be set, not once but several times. The authorities could not believe, however, that Dexter would ultimately be convicted.

Furthermore, San Antonio has engaged in a program of multiple seizures of the same motion picture without any adjudication of obscenity following the first seizures. In the pretrial order the defendant lists as one of its contentions that *Heller v. New York* "does not proscribe subsequent arrests and seizures for separate and distinct offenses committed by the same person on separate occasions prior to which complete adver-

sary hearings were conducted by a neutral magistrate." It is hard for the court to see how the district attorney of Bexar County could possibly read *Heller v. New York* in this way. The district attorney puts much emphasis on the "adversary hearing" aspect of this case, but we need not unduly concern ourselves with that aspect. The magistrate in *Heller* viewed the film in the theater, just as the magistrate in this case. In such a situation an "adversary" hearing is not required at all—the film itself is sufficient to establish "probable obscenity" to subject the film to seizure. The fact that the magistrate notified the attorney and gave him the opportunity to appear at a "hearing"—which consisted of nothing more than the testimony of the police officer and the viewing of the film does not transform San Antonio's procedures into an adversary hearing, the results of which would have the force and effect of a final adjudication of obscenity. We assume that San Antonio is asking us to hold that their procedures are something more than an inquiry into the probable obscenity of the film. This court will not so hold. Bexar County might be commended in other circumstances for its evenhandedness in notifying the defense attorney and allowing him to participate in the proceedings, but its actions would not change the function of the hearing which was to determine "probable obscenity."

*Heller* held that when the magistrate issuing the warrant actually views the entire film, an adversary hearing prior to the seizure of the film is unnecessary because he has a full opportunity for an independent judicial consideration of probable obscenity. It is implicit in the *Heller* opinion, however, that the decision depended upon the fact that after its seizure:

> [O]f course, the film was not subjected to any form of "final restraint," in the sense of being enjoined from exhibition or threatened with destruction. A copy of the film was temporarily detained in order to *preserve it as evidence*. There has been no showing that the seizure of a copy of the film precluded its continued exhibition. Nor, in this case, did temporary restraint in itself "become a form of censorship," even making the doubtful assumption that no other copies of the film existed. (No emphasis added.)

413 U.S. at 490, 93 S.Ct. at 2793. Any way one reads this language, one must come to the conclusion that *Heller* implicitly forbids multiple seizures of the type in which Bexar County engaged.

The import of the *Heller* case was recently analyzed in Judge Taylor's recent opinion, *Bradford v. Wade*, 376 F.Supp. 45, 47 (N.D.Tex.1974):

> [A]t what point can the local authorities seize other copies of the same film that has already been seized? The Supreme Court in *Heller* reaffirmed the proposition that a valid final restraint can only be imposed upon a judicial determination in a full adversary proceeding. The only purpose of seizing a film is for use as evidence. No further copies can be seized until the film is determined to be obscene by a judicial determination on the merits. The Court even said that if the exhibitor does not have another copy of the film, he is to be allowed to copy it for further showing. To not do so, would allow the administrative procedure to become a form of prior censorship.

There is no evidentiary reason why this film should have been seized more than one time. When viewed objectively there is no logical reason why this film was seized four times except that the authorities were attempting to harass the theater and its employees and to eliminate the exhibition of this film— prior to any final judicial determination of its obscenity. It is no answer that the authorities were unsuccessful at their chosen task. Resourcefulness in the face of official harassment should not inure to the benefit of the official harassers.

In a companion case to *Younger v. Harris, supra, Perez v. Ledesma*, 401 U.

S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971), the Court expressed the exception to its general holding that long standing equitable and comity principles prevent a federal court from interfering with a pending state court criminal prosecution whether by injunction or by declaratory judgment:

> Only in cases of proven harassment or prosecution undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown is federal injunctive relief against pending state prosecutions appropriate.

401 U.S. at 85, 91 S.Ct. at 677.

■ The actions of the Bexar County and San Antonio city officials, in the first place, in conducting multiple seizures of the same film, and in the second place, of charging the plaintiff with violation of a statute which is manifestly inappropriate to the situation, together constitute sufficient bad faith harassment and special circumstances to take the case out of *Younger v. Harris, supra,* and this court finds that plaintiff has proven harassment *and* prosecution undertaken by state officials in bad faith without hope of obtaining a valid conviction. The Fifth Circuit said in *Shaw v. Garrison,* 467 F.2d 113 (5th Cir. 1972):

> We hold as the language of *Younger* makes clear, that a showing of bad faith or harassment is equivalent to a showing of irreparable injury for purposes of the comity restraints defined in *Younger,* because there is a federal right to be free from bad faith prosecutions. Irreparable injury need not be independently established.
>
> * * * * * *
>
> The finding of a bad faith prosecution establishes irreparable injury both great and immediate for purposes of the comity restraints discussed in *Younger.*

467 F.2d at 120.

The most important rationale for the holding in *Younger v. Harris, supra,* is the belief of the Justices that "defense against a single criminal prosecution" in a state court will in most instances be sufficient to protect any defendant's federal constitutional rights. There is a further serious question in this court's mind of whether or not the plaintiff in this case would be afforded the opportunity to defend himself. He is subject to three felony charges but these had not been brought to the grand jury at the time of the hearing before the three-judge court—a space of some five months. When asked about the status of the felony cases, the district attorney asserted that his office was under the impression that the temporary restraining order issued by the managing judge prohibited the presentation to the grand jury. The temporary restraining order read, however:

> [D]efendants . . . be and they are hereby restrained and enjoined from further seizures of versions of the film "Deep Throat" at the Fiesta Theatre, San Antonio, Texas and from arresting the plaintiff, or employees of said theatre, so long as "Deep Throat" is showing at the Fiesta Theatre, San Antonio, Texas . . . .

This temporary restraining order was first issued July 29, 1974, and was successively extended over the continuing protest of the defendant. It was superseded by an order entered September 6, 1974, which enjoined, until the three-judge court could meet and decide, "all proceedings and activities with regard to the Plaintiffs in the consolidated cases." Clearly, however, the order excluded from its purview "pending state criminal prosecutions" and left the state "free to bring to trial and try any such cases." Neither of those orders entered by the managing judge was intended to, nor does a clear reading of them lead to the conclusion that they, prevent the state from presenting a case to the grand jury.

■ This court believes that a further reason for the inapplicability of the

*Younger* decision in this case is the fact that the state failed to present these charges to the grand jury and through no fault of the plaintiff has prevented him from defending himself in a state court.

■ The merits of this case are easily disposed of. The statute, § 16.01 of the Texas Penal Code, is clearly drawn and very specific. Fault lies not with the legislature in this instance but with the local authorities who brought charges under this law. The statute was obviously designed to deal with a very small class of property which can be used only for the commission of crime and to deal with persons in possession of such property or engaged in the manufacture or adaptation of the property exclusively for use in criminal activities, before the criminal activities are undertaken or completed. By no stretch of the imagination could this statute be used to cover the plaintiff's actions or the possession of an ordinary portable 16 millimeter motion picture projector with removable interchangeable reels.

■ The court declares that it was applied by the Bexar County and San Antonio city authorities unconstitutionally to the plaintiff motion picture exhibitor. Accordingly, having also found the requisite irreparable harm, the court enjoins the state from prosecuting plaintiff Dexter on the pending felony charges pursuant to § 16.01 of the Texas Penal Code, arising from incidents on June 24, June 28, and July 2, 1974, and in future from prosecuting any motion picture exhibitor for possession or use of equipment which can be used for any lawful purpose.

IV. *Ellwest Stereo Theatre, Inc. v. Donald Byrd, et al., CA–3–74–130–E*

The plaintiff in this case operates the Ellwest Stereo Theatre in Dallas, Texas. The theater operates what is referred to in slang terms as a "peep show." A number of viewing booths, said to resemble voting booths, each with its own stool and its own projector are provided for patrons who put coins in a coin slot in order to begin the operation of the projector. A short motion picture may then be viewed. On January 24, 1974, a police officer of the city of Dallas entered the theater armed with a search warrant issued by a justice of the peace pursuant to § 18.02(2) of the Texas Code of Criminal Procedure. The officer seized three films and three film projectors. With the aid of tools, three coin boxes with their contents were removed. On January 29, 1974, the police officer again entered the premises of the Ellwest Stereo Theatre with a search warrant issued by a justice of the peace and seized two films, two film projectors and two stools. Walls which formed two viewing booths were also removed with the aid of tools.

The parties stipulated that the projectors, coin boxes, booths, and stools seized by the police on January 27 and 29, 1974, belong to the Ellwest Stereo Theatre, Inc., and that Ellwest Stereo Theatre, Inc., has never been prosecuted for a violation of the Texas obscenity laws, articles 43.22, 43.23, or 43.24 of the Texas Penal Code. This is true despite the fact the property seized has been in police custody since its seizure.

Before approaching the merits of the case, we must decide the jurisdictional questions raised by defendant at oral argument. Defendant contends that since apparently plaintiff has abandoned its claim for injunctive relief, this court has no jurisdiction to hear its remaining claim for declaratory relief.

The court has found only one case in which it is stated that there is no jurisdiction in the three-judge court to hear a declaratory judgment action alone. *Long Island Vietnam Moratorium Committee v. Cahn*, 322 F.Supp. 559 (E.D. N.Y.1970) said in a case in which the plaintiff had represented to the court that no present need for equitable relief existed in view of the fact that the defendant district attorney had agreed to

hold off his threatened prosecution until the three-judge court had acted:

> [W]e do not consider the representations of the parties to amount to a withdrawal of a request for injunctive relief, without which, of course, this three-judge court would have no jurisdiction.

322 F.Supp. at 561.

 The district court cites two Supreme Court cases, *Swift & Co. v. Wickham*, 382 U.S. 111, 86 S.Ct. 258, 15 L. Ed.2d 194 (1965), and *Flemming v. Nestor*, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed. 2d 1435 (1960). While not inappropriate to the subject matter, these cases are not strong authority for the conclusion reached by the New York court. The *Swift* case concerns the applicability of the three-judge court statute, title 28, section 2281, to a case in which a state statute is challenged on the grounds that it interfered with the supremacy clause of the United States Constitution. Having concluded that the statute was not meant to deal with such questions, the appeal was dismissed for want of jurisdiction. In light of the fact that the declaratory judgment phase of a case is often dealt with by a three-judge court in conjunction with a plea for an injunction, it is not jurisdictionally improper for a three-judge court to hear a declaratory judgment case. In the *Flemming* case the constitutionality of a federal statute was "drawn into question," in a suit seeking the reversal of the decision of the Secretary of Health, Education and Welfare pursuant to the social security laws. The case decided that when the constitutionality of a statute is drawn into question, but no injunction is sought, a three-judge court is inappropriate.

In the case to which defendant has cited us, *Triple A Realty, Inc. v. Florida Real Estate Commission*, 468 F.2d 245 (5th Cir. 1972), a single district judge had entered a declaratory judgment that a Florida statute was unconstitutional. The district judge went further to enjoin the state from using this statute.

The state appealed on the grounds that a single judge had no authority to issue an injunction and the Fifth Circuit agreed. The court held:

> It is well settled that a three judge panel is required to enjoin state officers from enforcing a state statute. There are several exceptions, however, and the three-judge statute has long been regarded as a highly technical rule which is to be construed strictly. One well-recognized exception is that actions for declaratory judgments, despite some similarity in result with actions for injunctions, are sufficiently different to fall outside the three-judge requirement. *Mitchell v. Donovan*, 398 U.S. 427, 90 S.Ct. 1763, 26 L.Ed.2d 378 (1970); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963).

The case does not hold, therefore, that it is jurisdictionally impossible for a three-judge court to hear a declaratory judgment. The *Mitchell v. Donovan* case cited by the Fifth Circuit in the quotation above concerns 28 U.S.C. § 1253, which provides for direct appeal to the Supreme Court of cases in which a three-judge court has granted or denied an injunction. The Supreme Court held that the losing party *could not* directly appeal to the Supreme Court a three-judge court's decision which did nothing more than issue a declaratory judgment. The case was not concerned with whether or not a three-judge court *could* issue a declaratory judgment alone or under what circumstances. In *Kennedy v. Mendoza-Martinez*, the plaintiff amended his declaratory judgment complaint to include a prayer for injunctive relief just before the beginning of the third trial in the case. However, the issues were framed for trial to exclude any injunctive relief, and the single district judge who heard the case never mentioned it in his memorandum opinion, findings of fact and conclusions of law, or his judgment. A declaratory judgment only was granted. The Supreme Court concluded that since no injunctive

relief was really at issue, there was no reason to convene a three-judge court and the single judge's decision could stand. The Court continued:

> Whether an action solely for declaratory relief would under all circumstances be inappropriate for consideration by a three-judge court we need not now decide, for it is clear that in the present case the congressional policy underlying the statute was not frustrated by trial before a single judge.

372 U.S. at 154, 83 S.Ct. at 560.

█ It would appear to this court that that question is still open and that this court is free to decide the issue, taking into consideration all of the circumstances surrounding the suit. In his original complaint filed February 13, 1974, plaintiff sought both injunctive and declaratory relief. On May 1, 1974, Judge Brown consolidated the case into the already existing block of cases for purposes of deciding the constitutionality of the obscenity statute. As late as September 4, 1974, when the complaint was amended, plaintiff was still seeking an injunction in addition to declaratory relief. Although the pretrial order does not seek injunctive relief, plaintiff's brief addresses itself fully to the question and all but invites the court to grant injunctive relief. Although plaintiff has not presented the point very precisely, the court cannot say that he has truly abandoned any claim for injunctive relief. Nor can we say that even if he did so abandon his claim at the eleventh hour it would be jurisdictionally inappropriate to hear the case given the circumstances. We therefore hold that plaintiff's claim for a declaratory judgment is properly before this three-judge court and will proceed to the second jurisdictional challenge.

█ Defendant has alleged that there is no case or controversy here, nor a substantial federal question presented because the plaintiff corporation has not been charged with any crime. The court believes that this fact is irrelevant to the determination of the question of case or controversy. The City of Dallas and the State of Texas have utilized their police powers against the corporation by seizing and retaining its property pursuant to a search warrant issued under article 18.02 of the Texas Code of Criminal Procedure. This presents a case or controversy, i. e., a live grievance. *Goosby v. Osser,* 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1972). Inasmuch as the plaintiff is engaged in the dissemination of motion pictures, presumptively protected by the first amendment to the United States Constitution, and the actions of the state have served to curtail that activity to some extent, the plaintiff has presented to the court a *question* which has substantial first and fourteenth amendment overtones worthy of consideration. Whether or not plaintiff's claim is meritorious, however, remains to be seen.

█ *Younger v. Harris* does not appear to be an issue in the instant case. It was not raised in the pretrial order, in the briefs, or at oral argument. There are no pending criminal prosecutions, at least against the plaintiff here. It has been intimated that there exist criminal prosecutions against individuals arising out of these seizures, but the court is completely unaware of the identity of the individuals involved or of exactly how or even if the property seized was used in prosecutions directed against them. In the recent case *Steffel v. Thompson,* 415 U.S. 452, 471, 94 S.Ct. 1209, 1221, 39 L.Ed.2d 505 (1974), the Supreme Court states in footnote 19: "The pending prosecution of petitioner's handbilling companion does not affect petitioner's action for declaratory relief." The footnote continues with a reference to *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), in which the pending prosecution of a doctor under the Texas abortion laws did not foreclose a declaratory judgment in favor of a pregnant woman against whom no prosecution was pending. Finding no jurisdictional, equitable,

comity, or federal bar to the maintenance of this suit, the court will proceed to the merits.

Article 18.02(2) of the Code of Criminal Procedure of Texas as amended effective January 1, 1974, reads:

[A] search warrant may be issued to search for and seize . . . (2) property specially designed, made, or adapted for or commonly used in the commission of an offense.

Plaintiff has asserted that article 18.02(2) is void on its face and as it applied to plaintiff for three reasons: (1) it places and enforces a prior restraint on material presumptively protected by the first amendment; (2) it is vague and overbroad; and (3) it fails to provide fair notice to persons affected by the statute of the items it proscribes.

As we have pointed out in our discussion of the *King Arts Theatre* case, the question of what is and what is not a permissible "prior restraint" is an involved one. Calling the use of article 18.02(2) a "defacto prior restraint" is, to this court, a confusion of the issues. In essence, the plaintiff is complaining that under the guise of searching for and seizing as evidence property which "is specially designed, made or adapted for or commonly used in the commission of a crime," the state can, to some extent at least, "shut down" the operations of an adult motion picture business.

The State argues that assuming that the motion pictures shown by the plaintiff corporation were obscene and knowing as we do that Texas has laws to prevent the commercial showing of obscenity, we are left with the indisputable fact that the equipment seized is equipment "commonly used in the commission of a crime."

■ In order to accept the state's argument, however, we must assume that the motion pictures shown were indeed obscene. This we cannot assume. Motion pictures are protected by the first amendment. Only if they are judicially judged to be *obscene*, using the guidelines set forth by the Supreme Court, do they cease to be protected by the first amendment. While it is true that the showing of a motion picture can be a crime, it is not a crime until it has been judicially determined to be so. This fact takes motion picture obscenity cases out of the realm of crimes such as gambling. A gambler may have a business and he may utilize gambling machines and instruments to carry on his business. The police, using article 18.02(2), may come in with a search warrant and seize all of his equipment, effectively shutting down his business. Such a case would not disturb a court for one reason: the gambler does not have any protections which fall outside the due process requirements of a state's criminal laws. The adult motion picture proprietor, however, no matter how lewd his neighbors and the police and the district attorney's office may think his business to be, has an added protection—the protection of the first amendment. Until the items which he shows are each proved obscene, he can show anything he wants to show. The police cannot shut down or attempt to shut down his business. *Cf. Marcus v. Property Search Warrants*, 367 U.S. 717, 730–731, 81 S. Ct. 1708, 6 L.Ed.2d 1127 (1961).

■ The state claims, however, that all it was attempting to do was to gather evidence for the trial of obscenity cases and the instruments used in the business were evidence of the crime. Certainly, projection equipment, coin boxes, stools, and portions of booths would not be relevant evidence in the trial of a case alleging commercial exhibition of obscene materials. Proof of the obscenity would seem to rise or fall with the material exhibited, not with equipment used to exhibit the materials. The Dallas city attorney asserted at the oral argument that the booth walls were seized as evidence of pandering. Once again we can only guess at the way in which pandering could be proved by the physical presence of the booth in the courtroom, as distinguished from a pho-

tograph of the wall or a lab report of any substances found upon the booth itself. The explanation of the seizure of the booth walls does not explain why or how the projecting equipment, the stools, and the coin boxes are evidentiary and none was offered.

In a case which does not involve the first amendment, this court might accept the "evidence" argument advanced by the City. It is too tenuous, however, when placed in the light of the first amendment. The law enforcement officers entered the theater not once but twice. Each time they seized not only the film shown but also the coin box and projector attached to each booth. Whether intentional or not, and we need not make such a finding here, their actions served to curtail the operation of the business. It is true that the theater has not been put out of business, but this appears to be the result of the "informal agreement," entered into by the parties before Judge Mahon, not to pursue the matter until this three-judge court had made its decision.

The state cites to us *Heller v. New York, supra,* asking us to hold that motion picture projection equipment is to be held to the same standards as the motion picture itself:

> [I]t appears consistent with the rationale of *Heller* to permit a seizure of projection equipment provided (1) such equipment is seized for a bona fide evidentiary purpose and not to suppress exhibitions of films and (2) seizure of equipment is made under the same procedural limitations applicable to film seizures under *Heller.*

Defendant's Brief, p. 5. The City in this instance has demonstrated an admirable understanding of the *Heller* case but has failed to show this court that there is any bona fide evidentiary purpose for the equipment seized here. Furthermore, all of the stipulated facts point to something far removed from a valid evidentiary search. This was a "raid," accompanied by crowbars and screwdrivers. *Heller* also stands for the proposition that these businesses were not to be shut down but were, on the contrary, to be allowed to continue with a minimum of disruption until obscenity had been proved. The officials in the instant case seem to have sought the maximum amount of disruption of the business.

The fact that the officials in the instant case abused the use of article 18.-02(2), however, does not necessarily render that statute facially unconstitutional. The statute is worded to take care of several situations, but it should be precise enough to guide officials acting in good faith. Examining the entire language of article 18.02 leads one to the conclusion that the words "commonly used in the commission of an offense" are superfluous and ambiguous. It is obvious that article 18.02(2) was written as a companion to section 16.01 of the new penal code which we dealt with above in the *Dexter* case. Section 16.01 refers only to property specially designed, made, or adapted for the commission of an offense, making its possession, manufacture, adaptation, sale, installation, or setting up with knowledge and intent a criminal offense. Article 18.02 provides for a search warrant for "property specially designed, made, or adapted for *or* commonly used in the commission of an offene." Section 16.-01, Practice Commentary, informs us that the statute was intended to catch the crime before it is committed. It excludes the "commonly used" or similar language because it would be too ambiguous for criminal culpability.

Since obtaining a search warrant deals only indirectly with criminal culpability, one assumes the legislature felt safe in keeping the "commonly used" language in the statute for use in ambiguous or close cases. After all, in the ordinary situation the statute providing for the issuance of a search warrant need not be too specific as long as the search warrant itself is specific. No doubt the legislature failed to foresee that the imprecision of the statute would

result in the situation we face here. The language in this situation has become a carte blanche for the authorities who can issue search warrants for items, the possession or manufacture of which cannot, under section 16.01 be crimes, since as we have determined in our treatment of *Dexter v. Butler,* above, section 16.01 is intended for only a very limited and specific class of property. The effect is more than incidental to the motion picture exhibitor who is presumptively protected by the first amendment.

What disturbs this court is the fact that as the statute is worded, there is no bona fide evidentiary purpose which the "commonly used" language could serve. In the first amendment area, even as the state argues, precision is essential. Although in most cases it is assumed that bona fide evidentiary purposes are the basis of searches and seizures, as is evident in this case, seizures in the first amendment area may not be for evidence at all. Article 18.02(2) as it is written is wide open to such abuses. It fails to guide the police officer swearing out the warrant or the magistrate issuing the warrant who later reviews the search and seizure under articles 18.09, 18.12, and 18.13. In the instant case the evidentiary value of the items seized (except the motion pictures themselves) is *de minimis* at best, but the threat to the first amendment rights of the theater owner is very great.

Would the striking out of the "commonly used" language create a gap, however, in the valid enforcement of other criminal laws? The subsections of amended article 18.02(1) through (9) provide for every possible contingency in which a search warrant could be needed:

Art. 18.02 Grounds for issuance

A search warrant may be issued to search for and seize:

(1) property acquired by theft or in any other manner which makes its acquisition a penal offense;

(2) property specially designed, made, or adapted for or commonly used in the commission of an offense;

(3) arms and munitions kept or prepared for the purpose of insurrection or riot;

(4) weapons prohibited by the Penal Code;

(5) gambling devices or equipment, altered gambling equipment, or gambling paraphernalia;

(6) obscene materials kept or prepared for commercial distribution or exhibition, subject to the additional rules set forth by law;

(7) drugs kept, prepared, or manufactured in violation of the laws of this state;

(8) any property the possession of which is prohibited by law;

(9) implements or instruments used in the commission of a crime.

The "commonly used" language of subsection (2) is completely unnecessary not only because there is no corresponding crime for which the property could be used to establish the offense but also because the magistrate does not have to be convinced to a certainty that the property sought is "specially designed, made, or adapted for the commission of an offense," he simply must determine whether or not there is probable cause to believe the property fits the category. When the property is received by the magistrate pursuant to article 18.09, article 18.12, and article 18.13, he can make a better determination.

Accordingly, this court declares that the language of article 18.02(2), "or commonly used in," is unconstitutionally vague and overbroad, is unconstitutional as applied to Ellwest Stereo Theatres, Inc., or any other individual or entity engaged in first amendment activities, in that its use can result in the seizure of equipment and materials which can be used for the exhibition of constitutionally protected items, not for the purpose of obtaining evidence, but

for the purpose of shutting down first amendment activities offensive to the authorities before a judicial determination of obscenity.

*V. Conclusion*

This three-judge court, having ruled on the merits of the three cases, directs counsel for plaintiffs in each of the three cases to prepare a form of judgment in each of these three cases consistent with this opinion and to do so within thirty (30) days of the date hereof and submit same to counsel for the defendants for approval as to form and then submit same to this three-judge court for approval and entry.

The remainder of the cases, found in the Appendix to this order, will be remanded to the single judge from whom they came. Each judge will hold a hearing on the question of bad-faith harassment or other special circumstances to determine if the case falls outside *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), or *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). Should the single judge determine that there is no bad-faith harassment or special circumstances, the cases will be dismissed by that judge in accordance with *Hunt v. Rodriguez,* 5 Cir., 462 F.2d 659, *rehearing granted in part,* 468 F.2d 615 (5th Cir. 1972).

Should the single district judge find bad-faith harassment or special circumstances, this three-judge court will receive the cases back and dispose of them in accordance with this opinion.

### APPENDIX

Cases pending before the three-judge court styled *Universal Amusements v. Vance,* C.A. 73–H–528:

*Universal Amusements v. Carol Vance,* C.A. 73–H–528 S/D

*Jones v. Dyson,* C.A. 3–7024–C N/D

*Associated Theatres v. Dyson,* C.A. 3–7398–C N/D

*Associated Theatres v. Wade* C.A. 3–7347–C N/D

*Hargrove v. Hill* C.A. 73–H–1114 S/D

*Southland Theatres v. Butler,* SA–73–CA–214 W/D

*San Antonio Bookmart v. Smith,* A–74–CA–078 W/D

*Ellwest Theatres v. Walls,* CA–4–74–45 N/D

*Cinema X v. Curry & Walls,* CA–4–74–28 N/D

*Sun Family Entertainment v. Hanna,* B–74–142–CA E/D

*Wells v. Miles,* A–74–CA–189 W/D

*Cook v. Peters,* SA–74–CA–176 W/D

*Carson v. Baily,* CA–7–74–65 N/D

*Claybrook v. Baily,* CA–7–74–43 N/D

*Lovely v. Driver,* CA–7–74–45 N/D

*McKenzie v. Butler,* SA–74–CA–315 W/D

*Gernon v. Simpson,* A–75–CA–34 W/D

Dismissed by this Order:

*King Arts v. McCrea,* CA–6–345 N/D

*Dexter v. Butler,* SA–74–CA–168 W/D

*Ellwest v. Byrd,* CA–3–74–130–E N/D